Campbell *vs.* Campbell *et al.*

---

W. C. and N. C. CAMPBELL, executors of CATLETT CAMP-BELL, deceased, plaintiffs in error, *vs.* ERNEST C. CAMP-BELL, *et al.*, heirs and legatees, and WM. H. CAMPBELL, *et. al.*, creditors of deceased, defendants in error.

NOTE. Judge WARNER being a party in this case did not preside.

When the difficulties encountered by executors in carrying out a will have been caused by their intentional and wilful disobedience to the provisions of the will, and of the law, a Court of Equity will not entertain a bill to marshal the assets, and should not enjoin creditors of the estate from suing, in order to direct the executors in the administration of the estate and save them from loss, etc.

Bill for direction and to marshal assets. Demurrer. Decided by Judge COLLIER. Meriwether Superior Court, August Term, 1867.

The executors of Catlett Campbell, deceased, filed a bill containing the following averments :

Catlett Campbell departed this life, leaving a will, and appointing his sons, Wm. C. and Catlett Campbell, the executors

31

thereof: this occurred on the —— day of August, 1862, at which time the State of Georgia, in solemn convention of her people, had severed her connection with the government before known as the United States of America, and had united her destinies with the then Confederate States of America, and war between the two governments was then progressing, arising out of the separation. But the government of the so-called Confederate States and the government of the State of Georgia then were (and the latter has ever continued to be) *de facto* governments, enacting laws which their citizens were bound to obey and they were justified in such obedience, and protected thereby, from loss or damage by reason thereof; and in October, 1865, said ordinance was repealed by a convention of the people of said State.

They proved said will, and the same was admitted to record, and they were duly qualified as such executors, and took possession of the estate of said deceased, had an inventory and appraisement made of the same, and returned to the Court of Ordinary. The legatees under said will, and the heirs at law of said Catlett Campbell, are as follows: Jane Campbell (the widow), said executors, Ernest C. Campbell, Susan S. Campbell (now Ferrell), and her husband, Micajah C. Ferrell, Eugenia E. Howard and her husband, Augustus B. Howard, children of the said deceased, and the grand children of his deceased daughter, Caroline Boykin, as follows, to-wit: Francis A. Boykin, *feme sole*, Amelia Boykin, Cornelia Boykin, Catlett Boykin (now Mitchell), and her husband, William Mitchell, Caroline Boykin, a minor without a legal guardian; and Francis Boykin, also a minor, without a legal guardian.

Said estate consisted of about one hundred and twenty negro slaves of the then estimated value of seventy-one thousand one hundred dollars, in Confederate currency, the only currency then existing in this State. Said executors believed, and, as they then thought, had just reasons for believing, that, at the close of the then existing war, which they believed just on our part, and hoped and believed would successfully terminate in our favor, they would be of equal or greater

value, in currency founded on a gold basis, by reason of the dimunition of laborers, white and colored.

Said estate also consisted of some five thousand acres of land, situated in said county of Meriwether, and divided mainly into three tracts or parcels; the one tract or parcel on and around the home place, the residence of deceased, at the time of his death, containing about two thousand eight hundred and fifty acres. Another of said tracts was called the Red Bone place, containing about fifteen hundred acres; and the other of said tracts called the Red Bone Piney Woods place, containing about nine hundred and fifty acres.

Said estate also consisted, in part, of two merchant mills; the one situate on the home tract, the other on the Red Bone tract; and a steam saw mill, on the Red Bone Piney Woods tract. The balance of said estate consisted mainly of mules and horses, stock of hogs and cattle, plantation tools, household and kitchen furniture, utensils, cotton, and provisions of various kinds.

The widow, Mrs. Jane Campbell, repudiating the will, claimed her year's support, and also dower in the lands of said testator. The executors believing the report of the commissioners touching the same to be excessive and illegal, and highly detrimental to the interest of the legatees, excepted to said report, in terms of the statute, and the same is still pending, undetermined, in Meriwether Superior Court; the widow, in the meantime, went into possession of the dower assigned, except the merchant mill. The mill, had before that time, to-wit, on May 5th, 1863, been sold at public sale, after legal advertisement, and in compliance with the law as to administrators' sales, when the same, including the mill privilege and ten acres adjoining, was bought by Ernest C. Campbell, at the price of fifteen hundred dollars, Confederate currency, and possession given in conformity therewith. But the dower controversy, touching said mill, having arisen, the purchase money has never been paid.

Jane Campbell having become possessed of said dower lands, (2430 acres, or other large number,) she either sub-let the same to one Howard Martin, or otherwise confederated

with him, by which he entered into possession of the whole, or a large portion thereof, and committed waste by cutting down and clearing up the wood and timber land on the same, to the great injury of the estate in remainder; whereupon, said executors filed their bill in Chancery in the Superior Court of Meriwether county, for enjoining waste and recovering damages against said Jane Campbell and Howard Martin. Said case is still pending and undetermined; the damages to be recovered, will, when recovered, be assets of the estate, as will also be the remainder in the dower lands, that shall be ultimately assigned to the widow.

The said estate also consisted of the old hotel in Greenville, and fifteen acres of land, known as the Boykin Tavern; this was also sold at public outcry, May 5th, 1863, for the sum of eight hundred dollars, Confederate currency. Also, at the same time, the Merchant's Mill, on the Red Bone tract, was in like manner sold with the mill privilege, and ten acres adjoining, at public sale for the sum of $1,500 00, Confederate currency; and at the same time, and in like manner, the Steam Mill was also sold, and brought two thousand dollars, Confederate currency. Said executors also sold, November 18th, 1862, on a credit of ten months, all the perishable property belonging to said estate, except such as was assigned to the widow, at public sale, and for Confederate currency, amounting to $23,184 97. All of said sales were public and legally advertised, and fair and *bona fide*, and to the highest bidder. All the amount of this latter sale was duly paid in Confederate currency, except the amount purchased by Ernest C. Campbell, $3,495 77; A. B. Howard, trustee for his wife, $2,583 10, less $1,458 20 paid, and Susan S. Campbell, (now Mrs. Ferrell,) her half the amount purchased on joint account with Nicholas C. Campbell, her share of the purchase amounting to $3,677 05, less $613 53 paid in by her, in all unpaid, the sum of $7,694 19, and makes said executors chargeable with the sum of $15,489 88, on account of sale of perishable property in Confederate currency, the same including the amount bought by them. The amount not collected, being owed by residuary legatees, and as it was

ascertained subsequently, would not be immediately used in the payment of debts, by reason that a portion of the creditors declined to receive Confederate currency, was suffered to lie over for future settlement with such legatees, each of whom were at the time pecuniarily in good circumstances, and the funds entirely safe, if subsequently needed in the payment of debts.

They also sold, for division among the legatees, all the negroes of said estate, on the 5th May, 1863, at public sale, and after due advertisement and compliance with the law as to such sales, and for Confederate currency, when the same sold for the sum of $127,655 00.  Wm. C. Campbell, took negroes in value in that currency, to the amount of............ ..................................dollars; Nicholas C. Campbell, to the amount of..................................dollars; Ernest C. Campbell to the amount of..............................dollars; Susan S. Campbell to the amount of.............................. dollars, and Augustus B. Howard, trustee for his wife, to the amount of................................dollars.   There was also a *bona fide* sale, to persons other than legatees, to the amount of $7,025 00.  In this case no money was required of the residuary legatees, inasmuch as the sale was adopted as the most satisfactory manner of dividing the same among the legatees; all being *sui juris*, and capable of thus getting from among the number such negroes as best suited them; the executors retained control over the property and solvent assets of the estate, which they deemed much more than sufficient to pay off and satisfy all the debts and expenses of the estate.   That this is the correct view of the sale is shown by the facts, that while a law of the Confederate Congress taxed executors' sales a per centum on the amount thereof, on these facts being made known to the Hon. E. G. Cabaniss, having charge of that business for the State of Georgia, through their counsel, R. H. Bullock, Esq., said tax was only charged on as so much of said sale as was made to persons other than legatees.   No money was ever paid in by the legatees on account of the sums charged against them in this sale; although from their wealth and known pecuniary

responsibility, the executors were satisfied with their abundant means and ability to do so, had any portion of the same been at the time needed for the payment of the debts and expenses of the estate. The executors left the same open and did not take receipts from them, either in whole or in part satisfaction, of legatees.

Of the cotton belonging to the estate, a portion was sold. The balance was placed, and remained for some time, in storage at Rogers' Factory, in Upson county. Some time in March or April last, seeing its liability to destruction by both Confederate and Federal soldiers, the executors sold the same for Confederate currency, for the sum of $6,486 00, and some time thereafter the same was burned at that place by the enemy under the command of Gen. Wilson.

The uncollected notes and accounts due the estate, are classed as good and doubtful, and insolvent. Certainty, in this regard, cannot be arrived at, at this time, as many persons who, one year ago, were esteemed wealthy, are now hopelessly insolvent, and others who may ultimately pay their debts, have no means of doing so, until the making of another cotton crop.

By the will of said testator, sundry specific legacies are given to his children, relatively small in comparison to the estate of the testator; all of these (except small monied legacies, intended to equalize value) were advancements made by the testator in his life-time, and of which the legatees had been in the enjoyment, possession and ownership, before the death of the testator—the will being merely confirmatory of their title. As to the south half to lot No. 8, in the First District of Meriwether county, the same was given to William C. Campbell, by the testator, in the year 1860. He once took possession of the same, in the life-time of the testator, and built a dwelling house and other outhouses thereon, and cleared sixty acres of land or other large number, thereon, and made other valuable improvements, and paid the taxes of the same, none of which he would have done but for his ownership as aforesaid. These specific legacies were not inventoried and returned as any portion of the testator's estate.

The specific monied legacies, named in the will, remain unsettled. They are advised and believe, that said Catlett Campbell, when in life, executed a mortgage on real estate to Howard Martin, and as the widow claims dower on the mortgaged lands, they ask the direction of the Court, if she should not contribute rateably to the payment of the mortgage debt.

The unpaid debts of said estate, as far as known, are set forth, and the amount, nature and character. Said executors gave due and legal notice to the creditors to render in their claims in terms of the law, but many of the creditors failed to do so, and it is only recently (if even now) that they have been able accurately to estimate the outstanding debts of the estate. They considered the estate not only solvent, but that large legacies would accrue to the residuary legatees, and conducted and managed the same on this hypothesis, and this would have undoubtedly been true, but for the unforeseen calamity of our subjugation as a people, and the consequent manumission of all our slaves by the military and other authorities of the United States.

The estate is now, for the reasons aforesaid, probably insolvent, but, in the opinion of the executors, the creditors who were paid their claims in full, in Confederate currency, actually received much less, in value *pro rata*, than will now be received by the remaining unpaid creditors. Thus far, in the execution of the will and payment of the debts, and in the management of the estate, they acted in good faith, and as far as they know and believe, for the proper interest of all, and without fault, as they believe, unless they shall be held responsible for the result of the war.

The unadministered assets consist of the home place, and lands adjoining undisposed of, according to the best estimate they can get of the same, containing 2728¾ acres, as follows:

\*    \*    \*    \*    \*    \*    \*    \*    \*

The remnants of land in the home tract, not assigned to the widow for the dower, have never been rented nor used since the death of the testator, and are not, and have not been, in a condition that anything could be realized from

them in the way of rent. Of the Red Bone tract, William C. Campbell, during the year 1863, 1864 and 1865, was in possession of about 125 acres fit for cultivation, and kept the same in repairs, and attempted to have the same cultivated; but during that time, owing to the then existing war and the fact that he was subject to military service, he made only one bale of cotton, weighing about five hundred pounds, and was not able to make sufficient provisions to pay the taxes, and support the negroes he worked on the place and his family, and he is, the present year, intending to cultivate, by himself and others, about 80 acres in corn and cotton, and 10 acres in oats.

N. C. Campbell, during the same years, 1863, 1864 and 1865, with his sister, Susan S. Campbell, jointly occupied about 270 acres, and attempted to cultivate the same—and with like results as to profits, they making during that time only five bales of cotton, weighing in the aggregate 2,000 lbs., but no corn or provisions for sale; and the present year he and Micajah B. Ferrell, husband of Susan S., intend, jointly, to cultivate about 250 acres of the same in corn and cotton, and about 50 acres of wheat.

A. B. Howard, one of the legatees, was, during said years, 1863-4-5, in possession of about 60 acres of the cultivatable land of said place, but made no cotton thereon, and owing to the fact of his absence in the military service and the taking of his stock by the enemy, they do not believe a support was made thereon. Said Howard intends, the present year, to cultivate about 25 acres in corn, cotton and wheat; they have permitted him to do so, and they ask that he be decreed to bring into Court such sum as may be deemed reasonable and equitable for the use and rent and profits aforesaid, and that said Ferrell and wife may do the same; and said executors offer to do equity, under direction, touching the use and occupation of said lands.

The Piney Woods Red Bone tract has yielded no rent; they, the present year, have been enabled to rent small parcels of it, amounting to about twenty acres, to J. Waddell, rents to be paid in fencing and repair of land.

The notes and accounts contained in the inventory remain uncollected, and, to the extent they can be collected, will be assets with which to pay debts. Not much can be done in the way of collection until another crop is made, and many of them will likely prove insolvent, and as to such as may prove doubtful or insolvent, they ask for an interlocutory order that the same may be sold and the proceeds of sale brought into Court for distribution; and in the meantime they ask the direction of the Court touching the same.

Their receipts and. disbursements of the assets of said estate, in Confederate currency, are as follows:

\*    \*    \*    \*    \*    \*    \*    \*    o

Of the Confederate assets on hand, they have the sum of nine hundred dollars, consisting of scrip for four per cent. bonds, which occurred in this wise: in paying the taxes of said estate to the Confederate government, the agent made a mistake and required some thousand dollars more than was due, and on rectifying the mistake, paid back the amount to that extent in said script. The balance of the same consists of Confederate treasury notes of the new issue. In fact, they have on hand, in said notes, the amount they have charged up as commissions. The other unadministered assets consists of the notes in inventory, $2,647 32, besides interest, and the accounts embraced in the same, the amount of $3,422 37—all of which were esteemed good and solvent at the death of testator, but many of which have been probably made insolvent or doubtful by the events of the recent war; also the note of $18,084 84 and interest, due by the estate of L. L. Wittock; also, the damages sustained by reason of the waste committed by said Jane Campbell and Howard Martin, to the remainder in the lands of the estate, which they do not estimate at less than $10,000; also, rents for use and occupation of lands as already stated. And they pray that it be ascertained what share of the mortgage debt of Howard Martin be paid by her, and that she be decreed to bring the same into Court, as assets for the extinguishment of said mortgage debt.

The creditors of said estate, so far as known, are    \*    \*

A large portion of these creditors have recently commenced

suit on their claims, and others would have done so but for the fact of having notice of this bill for direction, and to marshal the assets of said estate, and if they be not enjoined, much of the estate remaining will be consumed in costs and expenses.

The balance of the lands of the home tract would probably sell best in a body together. This cannot be done until the lands to be set off as dower to the widow is settled and determined; and for the like reason the estate in remainder, on the termination of the dower, cannot be sold, advisedly, until the quantity of dower is ascertained. They do not believe it advisable to bring any of the lands of said estate into market until the present crop is planted, made and gathered, as money is exceedingly scarce, and in the hands of the fortunate few who had cotton that escaped destruction by the enemy, and they are averse to selling on a credit, as it is almost impossible, at present, to know who are solvent. They ask the direction of the Court of Chancery, as to the sale of said lands.

They also ask that the damages that may be assessed against said Jane Campbell and Howard Martin, for waste committed as stated, may be brought into Court and distributed in like manner, and if a less number of acres shall be assigned the widow for dower than that in her possession, she be decreed to bring into Court the proper rents for such excess; and also, they ask the direction of the Court, whether the said Jane, by reason of the waste, has not forfeited her dower in said estate, and whether the fee therein is not subject to be sold, in payment of the debts of said estate.

They ask the direction of the Court in reference to the proceeds of the sale of the Merchant Mill, in dispute as to dower, and to ascertain what, if any, deduction shall be made in the event a life interest therein shall be awarded to the widow; and also the amount of purchase money now to be paid, by reason of the sale for Confederate currency, and that the said Ernest C. Campbell be decreed to pay the same into the Court for payment of debts, and that said mill stand security for such payment: they also ask the direction and protection

of the Court, as to the amounts uncollected from the residuary legatees, as aforesaid, arising from the sale of the perishable property, and if it is found that the same is a fund for payment of debts, that, in that event, the amount in present currency be ascertained, and they be decreed to bring the same into Court, and that the property so purchased, so far as now in the hands and in possession of said legatees, stand security for the payment of the decree in this behalf.

Further, they ask the direction and protection of the Court in reference to the division of the slaves as stated, and submit that the only possible injury resulting to creditors therefrom was the profits, or hire, of such slaves, for the years 1863 and 1864, and from the condition of the country, and the fact that they, and all other able-bodied men, were compelled to be in the military service, and the large assignment of lands to the widow, the chances are that more loss than benefit would have accrued to the estate by their remaining undivided, and they, in causing said division to be made, acted in good faith, and, as they believe, for the best interest of legatees and creditors; and they ask the direction of the Court as to the specific legacies and gifts, or advancements, made by said Catlett Campbell to his children in his life-time, whether the same were not reasonable, in view of his circumstances at the time made.

In the life-time of said Catlett Campbell, they purchased, on joint account, from him the steam mill, situated as aforesaid, and expended a large sum of money in filling up and repairing the same; and for that purpose they borrowed the sum of $800 00 of one Moses Brown, and expended the same for that purpose; and afterwards, and in the life-time of the said Catlett, they, at his request, surrendered back said mill to him with the outstanding accounts thereof—the said Catlett agreeing to reimburse them for the expenditures aforesaid; and the note given by them to the said Brown was assumed by the said Catlett, and which he died, they believe, without discharging.    They ask the direction of the Court, whether said note is in equity the note of said Catlett Campbell, and entitled

to be paid *pro rata* with other debts by note, and as of the same dignity with them.

They further show, that some short time after the death of said Catlett Campbell, they proceeded to have the cotton belonging to said estate, and then in store in the warehouse of Smith & Oneal, in LaGrange, sold, in order to pay off the debts of said estate, and trusted to the representations of the said Smith & Oneal, as to the quality of said cotton, as they only had the warehouse receipts of Smith & Oneal for some sixteen bales. Said Smith & Oneal sold the cotton which they represented to belong to the said estate then in their possession, and, deducting storage and commissions of sale, turned over to them, as the net proceeds thereof, the sum of $6,684 69, in Confederate currrency, which they received and applied to the payment of debts, since which time the said Smith & Oneal claim to have made a mistake, and to have sold some twenty or more bales of cotton that did not belong to said Catlett Campbell at the time of his death, and that they are bound to make restitution therefor. And inasmuch as they acted in good faith in the matter, and trusted to information given them by Smith & Oneal, and acted upon it in receiving the money, they ask the direction of the Court, whether in equity and good conscience, whatever remuneration shall have to be made said Smith & Oneal in the rectifying said mistake, (if there be a mistake,) shall be paid out of the funds of said estate.

Said Catlett Campbell, at the time of his death, was administrator on the estate of L. L. Wittick, deceased. He took this administration, in order to secure some part of the note he held on said Wittock, of $18,084 84 and since his death, John W. Boyd, clerk of the Superior Court of said county, has taken administration *de bonis non* on the estate of said Wittock, and they have turned over to him the effects of said estate, so far as known to them, and if anything shall be realized therefrom, they ask that the same be brought into Court, and distributed under its direction. No considerable amount will be realized therefrom, as the only assets

Campbell *vs.* Campbell *et al.*

known to exist consist of wild lands, the quantity and value of which are unknown to them.

They have been recently advised that Catlett Campbell, in 1861, subscribed to the Confederate Government, one hundred bales of cotton, or other large number, to be exchanged for bonds of the Confederate States, only one half of which, it is claimed, was performed by said Catlett Campbell in his lifetime. They know nothing of this, of their own knowledge, and make this statement on information derived from the agent of the Federal Government, and ask the direction, and seek the protection of the Court thereon.

They pray the Court to grant and decree that all and singular the property of said estate, be sold, and the money and funds of said estate be brought into Court, and the assets marshaled and paid to those who shall be entitled to the same, and they be discharged from the trust; and that Ernest C. Campbell be enjoined from selling or otherwise disposing of said mill, so purchased by him, until the further order of the Court; and that Ernest C. Campbell, A. B. Howard and wife, and Ferrell and wife be enjoined from selling any specific perishable property, bought by them of said estate, at said executor's sale, and not paid for until the like order; and that each and all of said creditors, who have instituted suits or have judgments or claims against said estate, be enjoined from the prosecution of the same, until the like further order in that regard, and that all and singular said creditors, who have not commenced suits upon their respective claims, be in like manner enjoined from doing so until such further order be granted in their behalf, etc.

### EXHIBIT A.

*In the name of God, Amen:*

I, CATLETT CAMPBELL, of Meriwether county and State of Georgia, make this my last will and testament, hereby revoking and annulling all others heretofore made by me:

ITEM 1st. I desire and direct that all my just debts be paid, without delay, by my executors hereinafter named; as I am

unwilling that my creditors should be delayed of their rights, as there is no necessity for delay.

ITEM 2d. I give and devise to my beloved wife, Jane, for and during her natural life or widowhood, two lots of land, numbers ninety-three and ninety-four, in the second district of said county, (Meriwether,) containing four hundred and five acres, more or less; about three hundred and twenty acres cleared and in cultivation, with all the rights and appurtenances to said lots of land in anywise appertaining or belonging. I also give and bequeath to my wife, in the same manner, a negro girl about — years old, named Polly; also, $500 00 in money, one fine bedstead, in her room, one wardrobe and bureau, in her room. The above property given in lieu of dower.

ITEM 3d. I give and bequeath to my son, William C. Campbell, a negro man about twenty years old, named Jack, and Harriet, about twenty-two years old, and four children; one hundred acres of land off of lot No. 8, first district of Meriwether county, on the south side of said lot, so as not to include the steam saw mill, with all the rights, members and appurtenances to said land in anywise appertaining or belonging to his and their own proper use, benefit and behoof forever, with full power to dispose of the same at any time.

ITEM 4th. I give and bequeath to my son, E. C. Campbell, negro boy, Bill, about twenty-one years old; Easter, twenty-two years old, and three children: John, a boy, Andrew, a boy, and an infant child.

ITEM 5th. I give and bequeath to my daughter, Sophronia Campbell, negro woman Martha, thirty years old, and five children: Solomon, a boy, Louisa, Emeline, Sanford and Mary; Catherine, twenty-eight years old, and two children, Sallie and Willie; $500 00 worth of land, or money out of my estate, one piano, one sett China, one bay mare, known as the "Columbus mare," one wardrobe, one bedstead and furniture, one bureau, one fine castor, the one that belonged to her mother; to her and her children, for their sole and separate use, free from the debts and liabilities of her future husband, with full power to dispose of the same at any time she may think proper or

to her interest. Any other property coming to her out of my estate to be secured in the same manner. I appoint my son, N. C. Campbell, trustee for the property herein bequeathed to my daughter.

ITEM 6th. I give and bequeath to my daughter, Eugenia Emeline, wife of A. B. Howard, Mariah and two children, Wash and John, Orsa, a girl thirteen years old, one sett of silverware, forks and spoons, three hundred dollars in money, in lieu of piano; to her and her children by her present or any future husband, free from the disposition of her present or any future husband. Any other property that may come to her from my estate to be secured in the same way. I appoint A. B. Howard trustee for the property herein bequeathed to my daughter and her children.

ITEM 7th. I give and bequeath to my son, N. C. Campbell, Wilkes, negro boy eighteen years old, little Caroline and her child, five hundred dollars worth of land or money out of my estate, to him and his heirs forever.

ITEM 8th. I give and bequeath to my grand children, children of my daughter Caroline, (deceased,) wife of F. A. Boykin, to-wit: Amelia Boykin, Cornelia Boykin, Catlett Boykin, Caroline Boykin, and Francis Boykin, Jr., their life-time, free from the disposition of their present or any future husband, a negro woman, Harriet, twenty-four years old, (no children,) Betsey, twenty-two years old, and her children—my daughter, Caroline, having received a piano worth three hundred dollars.

ITEM 9th. Should there be twenty thousand dollars after my just debts are paid, for each of my children, to-wit: Wm. C. Campbell, E. C. Campbell, Sophronia Campbell, E. Emeline Howard, N. C. Campbell—then my grandchildren, as named in item eighth, to share an equal distribution with my children named in this item, that is to say, if there are any effects over twenty thousand dollars to each, then my grandchildren, they as one share, to have one equal share—otherwise, they will receive nothing more from my estate. I appoint F. A. Boykin trustee of the property bequeathed to my grand-daughters.

ITEM 10th. The rest of my property, both real and personal, wherever and whatever it may be, to be sold to pay my just debts, and the remainder of my property to be divided among my children as already stated in this my will.

I constitute and appoint my sons, W. C. Campbell and N. C. Campbell, executors of this my last will and testament.

CATLETT CAMPBELL.

August 25, 1862.

Signed, sealed and published by Catlett Campbell, as his last will and testament, in presence of us, the subscribers, who subscribed our names hereunto in the presence of the testator and of each other.

THOMAS SIMMONS,
DANIEL CARROLL,
WM. J. MITCHELL,
G. B. ROLLINS.

The exhibits were an inventory of the appraisement of the estate made in November 1st, 1862, and an inventory of the rights and credits of deceased, made on the 23d of October, 1862, with an account of the sales of perishable property, showing who bought it, and at what price, and a copy of the returns of the executors; a copy of the appointment of commissioners to set apart the widow's year's support, and their report, etc.; the application for dower, the appointment of commissioners to assign it, their report and the exceptions filed thereto; the bill in equity against Jane Campbell and Howard Martin; a statement of the cases pending against the executor, the judgments against the estate, etc.; the mortgage by deceased to Richardson & Martin.

Various amendments were filed, making new parties defendants, changing the prayer to fit the circumstances after the bill was filed, etc.; but none of them affect materially the equity of the bill.

To this bill the defendants, Edward H. Martin and Jane Campbell, demurred, upon the ground that it was multifarious; that by its face it shows said executors had a complete remedy at law, and that the Common Law Court has already

Campbell *vs.* Campbell *et al.*

jurisdiction of the cause, and because the same contained no ground of equity, etc.

The Court sustained the demurrer. To this said executors excepted, and brought it here for review.

B. HILL, for complainants, made the following citations: Code of Geo., sections 3076, 3077. M. & W. R. R. Co. vs. Parker, 9 Geo. R., 377, 393. Burr & Bogart, *et al.,* vs. Strohecker, 21 Geo. R., 422. Walker & Bradfield vs. Morris, 14 Geo. R., 323. 1 Story's Eq., sections 543, 546.

WM. DOUGHERTY, for defendants.

HARRIS, J.

By the 3089th section of our Code, (Irwin's edition,) it is provided that in all cases where legal difficulties arise as to the distribution of assets in the payment of debts, or where, from any circumstances, the ordinary process of law would interfere with the due administration, *without fault* on the part of the representative of the estate, a bill to marshal assets will be maintained at his instance. So, too, if difficulty had occurred in the construction of the will of Catlett Campbell originally, these executors might have had (upon a bill filed in the Superior Court, as that would have been in accordance with a jurisdiction frequently exerted,) personal protection from liability, by thus obtaining the direction of that Court and pursuing it when afforded.

This record exhibits no such application. It is very voluminous, and presents many difficulties which have occurred in the course of the execution of the will, and some existing now, inducing them to file this bill to marshal the assets of the estate remaining, and to enjoin the execution creditors of Catlett Campbell, whilst in life, to refrain from the collection of their *fi. fas.* until said assets shall be so marshaled, etc.

The important question to consider before granting the prayer of complainants is, how have these difficulties arisen? In vain has been our search for any evidence that they were accidental—for anything that would show that they were not

32

imputable to complainants.   The will they undertook to ex-
cute was plain, clear and specific in its directions, and so, too,
were the commands of law in cases where the will was silent.
Neither the one nor the other was followed by complainants,
but were utterly disregarded, they taking upon themselves
the responsibility *of acting on their own judgment,* and this
without any discretion given them.   The difficulties they
now encounter are solely the consequences of their *intentional
and wilful disobedience.*   A Court of Equity has no jurisdic-
tion in such a case as that of complainants' to afford the relief
prayed for, nor ought it to have such power.

Judgment affirmed.